884 So.2d 634 (2004)
Gene ALONZO, Malcolm Alonzo, Richard J. Assevedo, Jr., George Barisich, Joseph Barisich, Dale Borden, Harry D. Borden, Donnie Campo, William Caywood, Pero Cibilic, Clear Water Oyster Inc., Joseh Collins, Ramo Domingo, Anthony Esteves, Jr., et al.
v.
STATE of Louisiana and the DEPARTMENT OF NATURAL RESOURCES.
No. 2002-CA-0527.
Court of Appeal of Louisiana, Fourth Circuit.
September 8, 2004.
*635 Glenn E. Diaz, Carlos Zelaya, David C. Vidrine, Danial C. Vidrine, and J. Wayne Mumphrey, Chalmette, LA, for Plaintiff/Appellee.
Richard P. Ieyoub, Attorney General State of Louisiana, Andrew C. Wilson, Jedd S. Malish, Special Assistant Attorneys General State of Louisiana, Burke & Mayer, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge MAX N. TOBIAS JR., Judge EDWIN A. LOMBARD).
JAMES F. McKAY III, Judge.
The defendant in this class action suit, the State of Louisiana, through the Department of Natural Resources (DNR), appeals the trial court's granting of the motion for summary judgment filed by the plaintiffs, Gene Alonzo and fifty-two other oyster leaseholders. We reverse and remand.

FACTS AND PROCEDURAL HISTORY
In 1965, the United States Congress passed a Flood Control Act which authorized construction of freshwater diversion structures at Caernarvon and other locations. In 1983, for the benefit of the oyster industry, the Louisiana Department of Wildlife and Fisheries (LDWF) published a report setting forth optimal salinity regimes for oyster production on State seed grounds which presented refined, targeted salinity regimes, including salinity regimes for Breton Sound Basin. In 1984, the United States Army Corps of Engineers prepared an environmental impact statement suggesting locations of target salinity concentrations or isohalines at three areas along the southeast Louisiana coast to enhance fisheries and to combat coastal erosion. To create these new regimes, the environmental impact statement proposed the construction of three freshwater diversion structures for three areas: (1) Bonnet Carre for the Lake Pontchartrain basin; (2) Davis Pond for the Barataria basin; and (3) Caernarvon for the Breton Sound area. The Caernarvon project was designed for the dual purposes of enhancing oyster production and coastal restoration; target salinities for accomplishing these purposes were set in Breton Sound at five parts per thousand (ppt) for an area near the structure and fifteen ppt for an area further offshore away from the structure.[1]
From the late 1970's to the early 1990's, there were clear indications that there would be adverse affects on oyster leases located in areas that had been historically fresh prior to 1960. In the spring of 1991, before the Caernarvon structure became operational, significant mortality occurred in the Breton Sound area as a result of a "freshet", a period of significant freshwater intrusion from both the overflowing *636 Mississippi River and other point sources around Breton Sound. By August of 1991, mortality levels had reached 75% to 100% of many of the oyster beds within private oyster leases throughout the Breton Sound estuary. At the time the oyster mortality had occurred or had been detected in July and early August 1991, Caernarvon had still not become operational. For the rest of 1991, the structure would only be operated at minimal flows due to the existing oyster mortality, which obviated the need to introduce any more freshwater, except in the immediate vicinity of the structure for coastal restoration purposes.
On March 29, 1994, a group of oyster fishermen filed the Avenal class action in the 25th Judicial District Court for the Parish of Plaquemines on behalf of all oyster fishermen in Breton Sound who claimed that their leases were adversely affected by Caernarvon. On April 26, 1994, these same plaintiffs filed suit in the United States Court of Federal Claims against the United States, i.e., the Army Corps of Engineers (the Corps), which designed, financed and built the Caernarvon structure, alleging a "taking" or inverse condemnation under the Fifth Amendment of the United States Constitution. The Corps moved for summary judgment on several grounds. On August 2, 1995, the Court of Federal Claims granted summary judgment concluding that the plaintiffs had no compensable expectancy in the continued artificially elevated salinity levels in historically freshwater marsh areas in Breton Sound.[2] On November 12, 1996, the U.S. Court of Appeals for the Federal Circuit affirmed the lower court's judgment, but on different grounds, holding that these same oyster lessees could not have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversions of the state and federal governments.[3] Thereafter, in the proceedings in state court, the DNR filed an exception of no cause of action based upon the result in the federal Avenal litigation. The DNR also filed a motion for summary judgment based upon the same evidence as was presented in the parallel federal litigation. Both the exception and the motion for summary judgment were denied as were writs taken to this Court. The DNR filed another motion for summary judgment based upon the doctrine of collateral estoppel, which was also denied. This Court affirmed on rehearing, ruling that collateral estoppel is not applicable in Louisiana.[4]
On December 7, 2000, the state court action proceeded to a jury trial. On December 15, 2000, the jury returned a verdict in favor of the plaintiffs awarding four of the five representative plaintiffs, Kenneth A. Fox, Fox Oyster Company, Clarence Duplessis and Nick Skansi, a uniform award of $21,345.00 for every single acre of their oyster leases. In addition, the jury awarded lead plaintiff, Albert Avenal, $1,000.00 per acre for a limited number of his leases.[5] The combined award to these plaintiffs was $48,275,935.00. On January 10, 2001, the trial court extrapolated these awards class-wide to all "similarly situated" *637 oyster leaseholders anywhere within the class area of Breton Sound. Consequently, the trial court's extrapolation constructively extended the award of $21,345.00 per acre to every single cyster leaseholder class member within the class area of Breton Sound. This Court affirmed. Avenal v. State, XXXX-XXXX, (La. App. 4 Cir. 10/15/03), 858 So.2d 697, writ granted, XXXX-XXXX (La.1/30/04), 864 So.2d 638. This matter is currently before the Supreme Court.
On May 2, 1996 in the 34th Judicial District Court for the Parish of St. Bernard, fifty-three (53) oyster leaseholders filed suit in the instant case against the DNR for alleged damages to oyster leases on State water bottoms in the Breton Sound area located east of the Mississippi River and west of the Mississippi River Gulf outlet (MRGO) in St. Bernard Parish. The plaintiffs also alleged that their oyster leases located in the Lake Borgne area east of MRGO in St. Bernard Parish were damaged. The plaintiffs contend that the damage occurred as a result of the freshwater outfall from one or more of the Mississippi River freshwater diversion structures. The plaintiffs' claims were based upon state law tort theories including negligence and strict liability, as well as deprivation of constitutional and property rights under the Louisiana and federal constitutions. On December 17, 1996, the plaintiffs amended their petition to name LDWF as a party-defendant, alleging that LDWF conspired with DNR to include provisions in the renewal oyster lease forms that essentially exculpate the State and its agencies from any and all liability arising out of damages caused to the plaintiffs' oyster leases as a result of coastal restoration projects; the plaintiffs claimed that the inclusion of this exculpatory language in the renewal oyster lease forms constituted a violation of the plaintiffs' constitutional rights and a taking of a constitutionally protected property right.
On August 16, 1996, the trial court in Avenal certified the class, with geographic boundaries of the impact area of the structure. This area encompassed many, but not all, of the Alonzo litigant leases. The leases in Breton Sound were within the defined class boundaries set by the Avenal court; the areas east of MRGO, including Lake Borgne, were excluded. The Avenal plaintiffs then disseminated the notice of class action in accordance with court approval, advising all potential class members that they would be included in the class action unless they opted out of the class action by January 15, 1997. The plaintiffs in the instant case, having already filed suit in St. Bernard Parish, subsequently completed and returned their opt-out forms prior to the January 15, 1997 cutoff date.
The LDWF filed an exception of improper venue which was denied by the trial court on January 3, 1997. The LDWF filed an application for supervisory writs which was granted by this Court on January 14, 1997.[6] This Court remanded, directing the trial court to either determine whether to dismiss the petition or transfer the matter to East Baton Rouge Parish. Thereupon, the plaintiffs voluntarily dismissed the LDWF from the litigation but did not eliminate all of the allegations involving the LDWF from the proceedings. The DNR then moved to have the case dismissed or transferred on the basis of this Court's ruling. The trial court denied the DNR's motion on July 24, 2001. The DNR applied to this Court for a supervisory writ, which was also denied.[7]
Trial of this matter was originally set for November of 1998. However, in September *638 of 1998, by joint motion of the parties, the trial date was continued due to the fact that discovery was still in its early stages; the trial was continued without date. An October 8, 2001 trial date was eventually set for a "first flight" of plaintiffs. These plaintiffs included individuals with leases located only in Breton Sound, individuals and corporations with leases in both Breton Sound and Lake Borgne, and individuals and corporations with leases located only in Lake Borgne. The majority of the lease acreage at issue in the first flight was located in Breton Sound. There were problems with discovery, which lead the DNR to file a motion to continue. The trial court granted the motion and the jury trial was reset for January 22, 2002. However, on December 17, 2001, the plaintiffs filed a second supplemental and amended petition, characterizing their claims as admiralty and maritime in nature, thereby eliminating the DNR's right to a jury trial.[8] The plaintiffs also moved for partial summary judgment at that time on the theory of res judicata seeking a finding of liability and damages against the DNR for their leases in Breton Sound based upon the judgment in the Avenal class action. The trial court granted the motion for partial summary judgment related to res judicata on January 11, 2002, which resulted in a total award of $291,828,840.00, or $21,345.00 per acre. It is from this judgment that the DNR now appeals.

DISCUSSION
On appeal, the defendant raises the following assignments of error: 1) the trial court erred in applying the doctrine of res judicata, as the requisite elements were not present and the ruling allowed the plaintiffs to completely avoid their burden of proof; 2) the application of res judicata was error since the plaintiffs had exercised their legal right to timely opt-out of the class, on which the court's decision was based, and were therefore not entitled to obtain the benefit of any rulings in that class action since there was no "identity of parties"; and 3) the trial court erred by essentially applying offensive collateral estoppel, a concept not recognized under Louisiana law.
In defining res judicata, La. R.S. 13:4231 provides the following:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
The doctrine of res judicata is stricti juris and any doubts concerning the application of this principle must be resolved against its application. Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210. Res judicata cannot be invoked unless all its essential elements are present and each necessary element has been established beyond all question. Berrigan v. Deutsch, Kerrigan & Stiles, LLP, XXXX-XXXX *639 (La.App. 4 Cir. 1/2/02), 806 So.2d 163. Under Louisiana law, res judicata does not apply where there is no identity of parties. State in Interest of Robinson, 517 So.2d 477 (La.App. 1 Cir.1987). Without an identity between the parties in the first action and the parties in the second action, the law of res judicata does not apply under La. R.S. 13:4231. Tranchina v. State, 99-1332 (La.App. 4 Cir. 6/9/99), 740 So.2d 713. The same rationale applies in class action situations. Hudson v. City of Bossier, 33,620 (La.App. 2 Cir. 2/25/00), 766 So.2d 738. In Ford v. Murphy Oil, 96-2913, 96-2917, 96-2929 (La.9/9/97), 703 So.2d 542, the Louisiana Supreme Court discussed the purpose and intent of a class action procedure with regard to res judicata:
The class action is a non-traditional litigation procedure permitting a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common or general interests to persons so numerous as to make it impracticable to bring them all before the Court. The purpose and intent of class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to the representatives who bring the action, but to all others who are "similarly situated", provided they are given adequate notice of the pending class action and do not exercise the option of exclusion from the class action.
In the instant case, there is no identity of parties with the Avenal case. Although, we have the same defendants in both cases, the plaintiffs in the respective cases are not the same. For there to be an identity of parties, the parties in each suit must be identical. That is not the situation we are presented with here. Furthermore, all of the plaintiffs in the instant case completed and returned their opt-out forms in the Avenal class action before the January 15, 1997 cutoff date. Accordingly, the doctrine of res judicata does not apply and the trial court erred in applying it.
With regards to collateral estoppel, it is imperative that we restate that Louisiana law does not recognize this doctrine. See Steptoe v. Lallie Kemp Hospital, 634 So.2d 331, 335 (La.1994); Welch v. Crown Zellerbach Corp., 359 So.2d 154, 156 (La.1978). In Welch, the Supreme Court rejected all forms of the doctrine, stating: Collateral estoppel is a doctrine of issue preclusion alien to Louisiana law. Developed in the common law, the device precluded the relitigation of issues actually decided in a prior suit between the parties on a different cause of action; as such, even if collateral estoppel existed in Louisiana law, it would be inapplicable by its own terms. This Court expressly recognized this concept in Avenal v. State, 99-0127 (La.App. 4 Cir 3/3/99), 757 So.2d 1 (opinion on rehearing 3/15/00), 757 So.2d at 12, writ denied, 00-1077 (La. 6/23/ 00), 767 So.2d 41, cert. denied sub nom. Louisiana Dep't of Natural Resources v. Avenal, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 486 (11/27/00).

CONCLUSION
For the foregoing reasons, the trial court's granting of a partial summary judgment based on res judicata is reversed and this matter is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
TOBIAS, J., concurs and assigns reasons.
TOBIAS, J., concurring.
I respectfully concur.
I agree with the majority that the motion for summary judgment granted in favor of the plaintiffs must be reversed for the reasons assigned by the majority. However, I respectfully disagree with the majority's statement that Louisiana law *640 does not recognize the doctrine of collateral estoppel, citing Steptoe v. Lallie Kemp Hospital, 93-1359 (La.3/21/94), 634 So.2d 331; Welch v. Crown Zellerbach Corp., 359 So.2d 154 (La.1978); and Avenal v. State, 99-0127 (La.App. 4 Cir. 3/3/99), 757 So.2d 1. Rather, as the Louisiana Supreme Court held in Welch, supra at 157, our civil law terminology differs from that of the common law, resulting in the limited application of the doctrine of collateral estoppel in Louisiana. Specifically, Louisiana does in fact recognize a limited version of collateral estoppel.
In this appeal, the state assigns three errors. Those errors deal only with the issue of whether the trial court erred in granting the plaintiffs' motion for summary judgment. Nevertheless, I note that I still adhere to my dissent in Avenal v. State, Dept. of Natural Resources, XXXX-XXXX (La.App. 4 Cir. 10/15/03), 858 So.2d 697, 709, writ granted XXXX-XXXX (La.1/30/04), 864 So.2d 638.
NOTES
[1] These zones were based upon the fact that below 5 ppt oysters can become stressed and die while above 15 ppt oysters can be subject to predation and disease. This optimal salinity regime targeting annual average isohalines in concentrations of between 5 ppt and 15 ppt allowed oyster propagation and cultivation to continue in an existing zone within Breton Sound while at the same time, fostered coastal restoration by freshening the upper Breton Sound basin and allowing plant life to return in an area where little, if any, active oyster production was occurring.
[2] 33 Fed.Ct. at 790.
[3] Avenal v. United States, 100 F.3d 933, 937 (Fed.Cir.1996).
[4] Avenal v. State, 99-0127 (La.App. 4 Cir. 3/3/99), 757 So.2d 1 (opinion on rehearing 3/15/00), 757 So.2d 1, 12, writ denied, 00-1077 (La.6/23/00), 767 So.2d 41, cert. denied sub nom. Louisiana Dep't of Natuaral Resources v. Avenal, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 486 (11/27/00).
[5] The difference in awards may have been due to the fact that Albert Avenal purchased some of his leases on the same day he filed suit.
[6] 97-C-0067.
[7] 2001-C-1670.
[8] This issue is addressed in opinion No.2003-CA-0553.